FOSECO INTERNATIONAL
LIMITED, Plaintiff,

v.

CHEMINCON, INC., Bimac,
Inc., Defendants.

Civ. A. No. 77–72982.

United States District Court,
E. D. Michigan, S. D.

Feb. 4, 1981.

Dickinson, Wright, McKean, Cudlip & Moon by W. Gerald Warren, Philip M. Frost, Detroit, Mich., Leydig, Voit, Osann, Mayer & Holt, Ltd. by Stephen G. Rudisill, Bruce M. Gagala, Chicago, Ill., for plaintiff.

Reising, Ethington, Barnard, Perry & Brooks by Ernie L. Brooks, Southfield, Mich., for defendants.

## OPINION

GILMORE, District Judge.

This is a patent infringement action brought pursuant to Title 35 of the United States Code. Personal and subject matter jurisdiction exist by virtue of 28 U.S.C. § 1338.

Plaintiff Foseco International Limited ("FIL.") is an English corporation with its principal offices located in Birmingham, England. Plaintiff is a centralized management company affiliated with other companies ("the Foseco group") operating in over 30 countries, including Foseco Limited in the United Kingdom, Foseco Canada, and Foseco Inc. in the United States. FIL and the operating companies are subsidiaries of Foseco Minsep. Plaintiff and the operating companies will hereinafter be referred to collectively as "Foseco."

Plaintiff presently maintains a staff of 134 persons whose primary function it is to carry out research and development on behalf of the metallurgical sector of the Foseco group.

Defendant Chemincon, Inc., ("Chemincon") a Delaware corporation with its principal offices in Milan, Michigan, provides management services and technical information.

Defendant Bimac, Inc., ("Bimac") is a Michigan corporation with its principal offices in Milan, Michigan. Bimac manufactures and sells products to foundries and steel mills in the United States.

This infringement suit involves U.S. Patent 3,804,642, entitled "Exothermic Antipiping Compositions" (the "patent in suit" or the "'642 Patent"), issued on April 16, 1974, to Foseco International Limited. The patent in suit was assigned to plaintiff in the Spring of 1971 by the named inventors, Bernhard Carl Rumbold and John Edward Cartwright (DX–1, DX–2). In 1973, both Rumbold and Cartwright left the employ of FIL. Rumbold was subsequently responsible for the manufacture and design of defendants' products, which infringe on the patent in suit. Rumbold is presently employed as president and manager of the two defendant companies.

Foseco instituted this action against defendants Chemincon and Bimac, accusing each of infringing the '642 Patent. Defendants answered the complaint and counterclaimed under the antitrust laws. Before trial, both defendants stipulated to infringement of the '642 Patent if the patent was found to be valid and enforceable by this Court. Defendants also admitted that the invention claimed in the patent in suit is novel under 35 U.S.C. § 102.

On plaintiff's motion prior to trial, defendants' antitrust counterclaim was severed for separate trial. The parties agreed to try the issues of liability only, deferring

the question of damages should the plaintiff prevail. Thus, the issues now before this Court are limited to the validity and enforceability of the '642 Patent. Plaintiff seeks a determination that defendants' infringement was willful and intentional, requiring an increased damage award under 35 U.S.C. § 284. Both parties have also prayed for attorneys' fees.

Defendants assert two principal defenses: that the '642 Patent is invalid under 35 U.S.C. § 103 by reason of obviousness in light of the prior art, and that it is unenforceable due to alleged fraud on the part of plaintiff in the prosecution of the '642 Patent.

## THE PATENT

The '642 Patent involves the use of exothermic antipiping compositions ("APCs") in the casting of molten metal. These compositions aid in preventing the formation of voids or "pipes" in the center of the casting as the metal cools and contracts. The "piping" problem is avoided by providing a reservoir of molten feed metal in a "feeder head" (or "hot top") at the top of the mold so that as the metal in the mold contracts, molten metal from the feeder head can flow into the mold and keep it filled. The feed metal in the feeder head is kept molten by the insulation provided in a series of side liner boards along the side walls and by an anti-piping composition on the top of the feed metal. These feeding aids, i. e. the side liner boards and the APC, reduce heat losses from the feeder head and thereby keep the reservoir of metal in a molten condition longer than the metal in the mold, so that the metal in the feeder head is the last to solidify. The feeding aids can be used only once because they are destroyed by the heat from the molten metal.

Feeder heads are nearly as old as the art of metal casting; they were used in the 16th Century to cast cannons. Feeding aids, including APCs, are a more recent development, having come into use by the metal industry at the turn of the 20th Century.

In any casting process which utilizes a feeder head, part of the molten metal in the feeder head solidifies and remains in the feeder head after the casting itself has solidified. At least part of the metal that remains in the feeder head is always wasted; thus more efficient feeder heads increase the yield of the metal being cast by reducing the amount of metal required in the feeder head in the first instance.

The addition of more efficient feeding aids reduces the size of the "pipe" and thereby reduces the amount of metal in the casting or ingot that must be scrapped or downgraded to a lower grade of steel after the casting or ingot has solidified. A reduction in the amount of metal which must be scrapped or downgraded is an increase in yield. Yield increases of a fraction of one percent not only permit significant cost reductions because lesser quantities of feeding aid material are required to be consumed in each casting operation, but also bring about an increase in profits for steel producers. Consequently, more efficient APCs and other feeding aids have been eagerly sought by the metal casting industry.

Most APCs are mixtures of raw materials. Single-ingredient anti-piping compositions are virtually unknown in the art.

Certain APCs rapidly generate heat by chemical reaction when placed on the surface of hot molten metal in a feeder head. Such APCs are known as "exothermic" anti-piping compositions. The term "exothermic" generally defines a process or chemical reaction which is accompanied by evolution of heat rather than using heat (the latter being an "endothermic" reaction). In the art of feeding aids, however, the term "exothermic" has a specific connotation—it refers to anti-piping compositions which react at a very fast rate and which produce large quantities of heat to counteract the initial chill created when the APC is applied to the top of the metal. After the exothermic reaction, the exothermic APC behaves like non-exothermic APCs in forming an insulating cover on the molten metal.

The '642 Patent discloses and claims a heat expandable anti-piping composition containing three component exothermics:

(1) a particulate refractory heat-insulating filler; (2) 10 to 50 percent exothermic component; and (3) one to 50 percent acid-treated graphite ("ATG") (a natural flake graphite which has been treated with acid so that it will expand to many times its original volume when heated). The patent claims as follows:

"1. In an exothermic composition comprised of at least one particulate refractory heat-insulating material selected from the group consisting of vermiculite, perlite, pumice, grog, silica flour, alumina, bauxite, magnesia, clays and other refractory silicates, and about 10–50 percent by weight of an exothermic component, the improvement wherein said composition contains about 1–50 percent by weight of acid-treated graphite which on heating intumesces to give a low density highly insulative vermicular structure, said composition yielding a heat-insulative layer when placed on the exposed surface of molten metal in combination with a minimization of carbon pick-up by the metal and dust generation.

"2. An exothermic composition according to claim 1 wherein the exothermic component is a finely divided easily oxidisable material.

"3. An exothermic composition according to claim 2 wherein the oxidisable material is aluminum.

"4. An exothermic composition according to claim 1 wherein the exothermic component is a mixture of an oxidisable metal and an oxidising agent therefor.

"5. An exothermic composition according to claim 1 which comprises 3–20 percent by weight acid treated graphite."

The '642 Patent teaches that exothermic APCs containing one to 50 percent acid-treated graphite (ATG) can be used at half the application rates used for prior APCs and yet produce improved insulation properties leading to increased yields, while at the same time minimizing carbon pick-up and dusting.

Plaintiff also applied for and obtained US Patent No. 3,811,898, a two-component patent (heat insulating refractory and acid-treated graphite) entitled "Heat Insulating Anti-piping Compound" (hereinafter called the "'898 Patent"). While the '898 Patent covers many of the compositions contained in the '642 Patent, the '898 Patent is not limited to compositions having an exothermic component.

## FACTUAL BACKGROUND

Plaintiff began making and selling anti-piping compositions in the 1940s; by the mid-1960s, Foseco had become a major supplier of such compositions to the metal casting industry around the world.

On March 14, 1967, U.S. Patent No. 3,308,514 (the "Osborn Patent") issued to Dow Chemical Company (PX–14b). The Osborn Patent was the first teaching of the use of vermicular graphite (acid-treated graphite) as a hot top. The Osborn Patent did not, however, teach the use of vermicular graphite in combination with other materials; rather, it described the benefits flowing from vermicular graphite alone, in either expandable or pre-expanded form, as an anti-piping composition.

The Osborn Patent aroused the attention of Foseco in England as to vermicular graphite and its use as an APC. On May 8, 1967, two months after the Osborn Patent issued, plaintiff launched Project No. 501/2, directed at the assessment of expanding anti-piping compounds as feeding aids (DX–7). Vermicular graphite, the subject of the Osborn Patent, was for the first time considered by plaintiff as a possible anti-piping component. Foseco's interest centered on a "qualitative assessment in order to find the most promising combination for use in an exothermic (or simple insulating) material." (DX–7)

On May 12, 1967, B. Edwards and F.E.G. Revault of the Steel Mills Division met "to review progress since the project was initiated on 8th May and discuss preliminary development programme." The earliest written reference to the use of vermicular graphite as an APC is contained in Revault's minutes of that meeting. The minutes stated that among the potential ingredients to be assessed in Project 501/2 was

"Vermicular graphite, . . . subject of Dow Chemical Company patent. Graphite treated in concentrated oxidising acid mixture becomes expandable on heating (up to 600 × original Volume)." (DX–7) Concern over the Dow Patent later became apparent when, in a letter from Fred Wallace to J. M. Macnair, technical director of the Steel Works Division, dated 6/21/67, "(C)larification of license position and our intentions in this matter" was requested. (DX–8)

In a memorandum dated 6/25/67, Revault wrote to Macnair, the Wallace memo "rightly pinpoints vermicular graphite as one of the most promising materials listed in the development programme for expanding Ferrux..." (DX–9) However, the memo also reflected plaintiff's awareness and concern as to the Osborn Patent: "It may not be wise to make an approach to Dow Chemicals at this stage, since it seems unlikely that a license would be necessary, and we do not want to draw their attention to our interest in the material." (DX–9)

Bernhard Rumbold became an employee of plaintiff in September of 1966, shortly after receiving his degree in chemistry from King's College in London. Rumbold functioned as an investigator, performing metallurgical research at plaintiff's laboratories in England.

Rumbold was not involved in the formative stage of plaintiff's project with vermicular graphite, nor had he received copies of the above-mentioned memoranda and correspondence (DX–7). Rumbold was present, however, at some discussions in the United Kingdom and also in the United States where Dow Chemical was seen as a potential problem in light of its patent in this field.

In June of 1967, while Rumbold was working in the Foundry Division of Foseco, he was selected to prepare vermicular graphite for testing (DX–8). Rumbold reviewed a copy of the Osborn Patent and was instructed to prepare some ATG in accordance with Osborn's teachings for investigation as part of Project 501/2. He tested ATG on an AMITEC instrument, an industry-accepted machine which measures the exothermic and thermic properties of feeding aids such as anti-piping compositions. According to Rumbold, the test results were favorable. Thus, he gave a sample of the ATG to the Steel Mills Division of Foseco and to Foseco Ltd. with the suggestion that they seriously consider ATG as an ingredient for exothermic anti-piping compositions. The Steel Mills Division disagreed with Rumbold's analysis and concluded that experimental APC containing ATG performed unfavorably. Consequently, in December of 1967, the Division abandoned the project to investigate the use of ATG in an exothermic APC, although some exothermic recipes containing ATG were in fact developed (DX–23). Foseco Limited likewise reacted disparately to Rumbold's conclusions and decided that exothermic APCs containing ATG were not a feasible commercial composition. Foseco Limited thus terminated its test work in 1968.

Rumbold nevertheless remained convinced of the potential commercial usefulness of anti-piping compositions containing ATG. He re-analyzed the Osborn Patent and re-tested ATG in combination with an exothermic APC on the AMITEC instrument. Employees of Foseco's United States operations were favorably impressed by Rumbold's demonstrations of the capabilities of an exothermic APC containing acid-treated graphite.

The Foundry Division of Foseco was apparently also reassessing the potential of anti-piping compositions containing ATG. Plaintiff added vermicular graphite to numerous existing exothermic recipes and learned that vermicular graphite was most effective in low density recipes (PX–72, DX–10, DX–23, DX–27, DX–65, DX–162, DX–170, PX–29, PX–127). By the fall of 1969, plaintiff had developed a non-exothermic APC which contained 20–25 percent ATG, 70–75 percent ball clay, and 5 percent slaked lime (calcium hydroxide). This formula was assigned an "Experimental Product," or "E.P." Number E.P. 4413 (PX–60). E.P. 4413 appeared sufficiently promising to warrant filing of a British patent application No. 57595/69 on anti-piping compositions containing ATG in combination with other materials on November 25, 1969. The

British application proposed 10–70 percent vermicular graphite, preferably 15–35 percent (DX–1).

Meanwhile, the Steel Division of Foseco Limited began a project to investigate ATG in exothermic anti-piping compositions.

By July of 1970, plaintiff had developed D.R. (Development Recipe) 1423, an exothermic APC containing 6 percent ATG. Various modifications of this formula were known as D.R. 1423A. Those compositions led eventually to the commercial production of Ferrux 707, from which all exothermic products containing ATG now sold by plaintiff were developed.

The composition was prepared by Foseco in England and sent to its affiliates in the United States, Canada, and other countries for testing in 1970. Plaintiff's present commercial product known as "Ferrux APC," which is a non-exothermic anti-piping composition, has essentially the same ingredients as the original E.P. 4413. By September of 1971, a pilot plant had been built in England to produce products containing ATG.

On November 23, 1970, plaintiff filed two separate patent applications in the United States: Serial No. 92,158, an exothermic anti-piping composition disclosing 1–50 percent (preferably 3–20 percent) vermicular graphite (the '642 Patent), and Serial No. 92,208 on vermicular graphite (10–40 percent) without a limitation to exothermic materials (the '898 Patent) (DX–1, DX–2). Rumbold did not propose the percentage of vermicular graphite in either of these applications, nor did he read the first applications before they were filed (PX–147).

On December 12, 1971, the patent examiner disallowed the claims of the plaintiff's U.S. applications, concluding as to the '642 application that its composition was an obvious substitution of Osborn's vermicular graphite for the graphite contained in a mold-coating composition of U.S. Patent 3,340,082 (the "Meyer Patent") (DX–3). The original U.S. applications were eventually refiled as continuation applications. On June 19, 1973, the patent examiner adhered to a rejection of the '898 and '642 applications under 35 USC 103, stating,

however, that "a showing of unexpected results filed in the present case would be considered." (PX–1, PX–2)

Plaintiff subsequently filed the Issott Affidavit in response to the examiner's request for a showing of unexpected results. The Issott Affidavit reported that test results indicated Osborn's vermicular graphite, when substituted into a Meyer composition, resulted in a composition that was inoperative as an anti-piping composition (DX–3). The patent office thereafter accepted the claims of the '642 and '898 Patents on April 16, 1974.

In the fall of 1973, Bernhard Rumbold and a fellow employee, Frederick Hambleton, terminated their employment with Foseco and accepted positions with Birtley Engineering, a subsidiary of Great West Steel Industries Ltd. Rumbold formulated and tested anti-piping compositions containing acid-treated graphite for Birtley. In December 1973 defendant Chemincon Inc. was formed, and Rumbold's work for Birtley was thereafter performed through Chemincon. In 1977, Birtley established the Bimac Division in Michigan to produce, distribute and market anti-piping compositions containing ATG.

Hambleton is presently employed as an officer of both Bimac and Chemincon. Plaintiff alleges that Rumbold, now a director and employee of Chemincon, formulated the ATG anti-piping compositions that Bimac has manufactured and sold in the United States—products which purportedly infringe upon the patent in suit.

## VALIDITY OF THE '642 PATENT

In *Reynolds Metals Co. v. Acorn Building Components, Inc.*, 548 F.2d 155, 159 (6th Cir. 1977), the Court noted:

"There are three essential elements of patent validity: novelty, utility and nonobviousness, which are codified in 35 USC §§ 101–103."

Defendants have raised no defenses in this action under 35 U.S.C. § 101 (utility) or 35 U.S.C. § 102 (novelty). However, defendants challenge the '642 Patent as obvious under 35 U.S.C. § 103. The defense of

obviousness is independent of, and unaffected by, the statutory requirements of 35 U.S.C. § 101 and 35 U.S.C. § 102. *Eisele v. St. Amour*, 423 F.2d 135 (6th Cir. 1970). Defendants further assert the unenforceability of the '642 Patent due to plaintiff's alleged fraudulent conduct before the Patent and Trademark Office.

### A. *Obviousness*

■ In assessing defendant's defense of obviousness, this Court begins with the basic proposition that a patent is presumed to be valid and that the burden of proof is on the party alleging invalidity 35 U.S.C. § 282. The statutory presumption of patent validity has been discussed by the 6th Circuit in *Eltra Corporation v. Basic, Inc.*, 599 F.2d 745, 750 (6th Cir. 1979):

> "In analyzing the validity of any patent we must begin with the statutory presumption of validity that accompanies its issuance, 35 USC § 282. *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 615 (6th Cir. 1978). The presumption has no independent evidentiary significance, however, as it merely serves to allocate to the party claiming invalidity the burden of proving it. *Reynolds Metals Co. v. Acorn Building Components, Inc.*, 548 F.2d 155, 160 (6th Cir. 1977); *Dickstein v. Seventy Corp.*, 522 F.2d 1294, 1296 (6th Cir. 1975), *cert. den.* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976); *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 713 (6th Cir.), *cert. den.*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975); *Rains v. Niaqua, Inc.*, 406 F.2d 275, 278 (2nd Cir.), *cert. den.* 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed.2d 222 (1969). In the typical case such as this, where the bulk of the evidence of the prior art is contained in documents, the party claiming obviousness need only do so by a preponderance of the evidence. *Dickstein, supra,* 522 F.2d 1295–97, *cf., Campbell v. Spectrum Automation Co.*, 513 F.2d 932 (5th Cir. 1975)."

■ A higher standard of proof of invalidity, by "clear and convincing evidence," will be applied to the unusual case, i. e. "where the evidence may be of an inherently unreliable nature ... or where fraud is alleged..." *Id.*, at 751. However, this higher standard is "simply not the 'basic rule' to be applied in cases involving alleged obviousness under 35 USC 103." *Id.*, at 751.

Defendants rely on 35 U.S.C. § 103 to invalidate the '642 Patent. That section reads as follows:

> "A patent may not be obtained though the invention is not identically disclosed or described as set forth in Sec. 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

Although Section 103 was enacted in 1952, it was not definitively construed until 1966 when the Supreme Court issued a trilogy of cases. See *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 U.S.P.Q. 459 (1966); *Calmar & Colgate-Palmolive Co. v. Cook Chemical Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 U.S.P.Q. 459 (1966); and *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, 148 U.S.P.Q. 479 (1966). In *Graham*, the Court set forth the primary tests and secondary criteria for determining obviousness:

> "The scope and content of the prior art; * * * differences between the prior art and the claims at issue; * * * the level of ordinary skill in the prior art. * * * Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham, supra,* at 7, 86 S.Ct. at 688.

See also *Eltra Corp. v. Basic, Inc., supra; Reynolds Metals Co. v. Acorn Building Components, Inc., supra; Philips Industries Inc. v. State Stove & Manufacturing Co.*, 522 F.2d 1137 (6th Cir. 1975).

In *Adams*, supra, the Supreme Court held that an invention may be patentable where all of the elements of an invention were known in the prior art but not utilized together, if the combination of the elements produced unexpected results from the prior art, particularly where the prior art indicates that the procedure utilized by the patent will be unproductive. *Adams*, supra at 50, 86 S.Ct. at 713. However, the Supreme Court has warned of the necessity to scrutinize combination claims:

"Accordingly, the District Court properly followed our admonition in *Great A&P Tea Co. v. Supermarket Corp.*, supra, 340 U.S. at 152, 71 S.Ct. at 130, 95 L.Ed. at 167: 'Courts should scrutinize combination claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements . . . A patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. . .'" *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976)

Thus, not every improvement in the art is patentable. The standard of invention, particularly in the case of a combination claim, is a "demanding" one. *Lear, Inc. v. Adkins*, 395 U.S. 653, 676, 89 S.Ct. 1902, 1914, 23 L.Ed.2d 610 (1969); *Eltra*, supra, at 751.

In reviewing the defense of obviousness, this Court must first assess the prior state of the art. Prior art references relied upon to show obviousness may include prior knowledge or use, prior patents and prior publications. The object and accompanying claims, as well as the inferences that one skilled in the art would draw from specific disclosures, constitute prior art. Even unworkable devices can constitute prior art. *Smith v. Acme*, 614 F.2d 1086 (CA6 1980). As stated by the 6th Circuit in *Smith*, supra:

"Prior art need not be exactly the same in order to be applicable; differences between the prior art and the invention are permitted. This is to say that the mere existence of differences between the prior art and an invention does not establish the invention's nonobviousness, particularly where, as here, the prior art and the invention are substantially similar. *Dann v. Johnston*, 425 U.S. 219, 229–230, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976)." *Id.* at 1093.

In the present case, the '642 Patent defines the relevant art as follows: "This invention relates to exothermic anti-piping compositions." (Col. 1, lines 5–6). Defendants contend that five prior patents and one of plaintiff's prior commercial products constitute the prior art which falls within the scope of the '642 definition.

### (1) The Charman Patent

A 1949 patent, U.S. Patent 2,462,255 (the "Charman Patent"), is the earliest known publication of a heat expandable exothermic anti-piping composition. The Patent explains that:

"This invention relates to improvements in insulating coverings for use upon solidifying metal castings, particularly ingots.

"Insulating covers for ingot sinkheads, feed heads, or risers, have been in use to some extent for many years." (Col. 1, lines 1–6)

The Charman Patent contemplated the use of any known heat expandable ingredient:

"This invention has to do with the use of insulating coverings for solidifying castings, comprising materials which will expand when subjected to the high temperatures of the castings, either when such materials are used by themselves or in combination with other combustible or incombustible materials.

"Expanding materials for the purpose of this invention may be natural or manufactured. Of natural materials perlite, a volcanic glass capable of expanding to six or seven times its original size, is an example, but vermiculite, a secondary mineral formed by alteration of blotite and phlogopite mica, found scattered about the world, and capable in some

forms of exfoliating up to twenty times its original size, is preferred at the present time. Amongst the manufactured expanding materials may be mentioned pyrotechnics such as Pharaoh's eggs and the well-known Fourth of July serpents, these materials being capable of expanding ten to fifteen times their original size. We prefer to employ vermiculite." (Col. 2, lines 14–35)

The patent further suggested that vermiculite was a potential material to be used in anti-piping compositions:

"Micaceous vermiculite ore may be obtained in relatively small particles. In its natural state each vermiculite particle has the appearance of a flake, but when heated sufficiently these flakes expand into a condition in which each one resembles a tiny accordion. A given quantity of the material in its natural state, when expanded by the action of heat, occupies a space many times greater than when unexpanded, the ore of No. 3 quality, which is readily obtainable in sufficient quantities, expanding to the extent of eight to twelve times its original volume. The fact that it may be shipped in its unexpanded low volume state and may be converted in situ to its high volume condition, obviously is of great practical importance from the standpoints of transportation, plant storage facilities and handling. (Col. 2, lines 36–52)

The Charman Patent disclosed three component compositions of the type found in the '642 Patent—(1) particulate heat insulating refractory material; (2) an exothermic component, and (3) an expandable material (which *did not* include vermicular graphite):

"For the purposes of the present invention, vermiculite ore, the No. 1 grade preferably, may be used as a covering either by itself or combined with materials of neutral or exothermic properties to form a bulk mixture." Column 2, lines 52–55; Column 3, lines 1–2.

"As useful inert fillers there may be mentioned slag, rock wood, sand, clay, ashes and crushed brick." Column 3, lines 54–56.

"Exothermic fillers should be slow burning or charring such as coal, sawdust, hulls, stalks, straws or any combustible wasteage." Column 3, lines 56–58.

### (2) *The Osborn Patent*

On March 14, 1967, U.S. Patent 2,308,514 (the "Osborn Patent") issued. The Osborn Patent teaches the use of vermicular graphite alone as a hot-top powder in both expandable and pre-expanded form:

"In operation, as the expandable graphite contacts the molten metal, it expands to a volume of from about 20 to about 600 times its original volume and usually expands to a volume of from about 200 to about 600 times its original volume. The resultant low density expanded vermicular graphite acts as an excellent insulator to assure substantially uniform cooling of the molten metal, as in a mold to prevent unduly rapid cooling of a molten metal in a ladle or holding pot.

"An unexpected advantage of this unique hot-topping process is that the graphite, as it expands, also conforms generally to the shape of the top of the mold, riser or pot or ladle thereby eliminating the need for cutting or otherwise forming the hot-topping material to a predetermined shape." (Col. 2, Lines 35–48)

### (3) *The Takashima Patent*

On July 21, 1961, Japanese Patent 11209/61 (the "Takashima Patent") relating to heat expandable exothermic anti-piping compositions issued. The Patent described the ingredients of the composition as follows:

"The insulating material of this invention is characterized by being principally based on the insulator of A1. series [metallic aluminum exothermic plus alumina insulator], with which either one or several kinds of such minerals as obsidian, perlite or vermiculite are mixed as an annex, resulting in the same effect with about half as much quantity as the conventional method."

Two other foreign patents, United Kingdom Patent 1,094,233 (the "Hinckley Patent"), which issued on December 12, 1967, East German Patent 67217 (the "VEB Patent"), issued on June 5, 1969, and one of plaintiff's own commercial products, "Ferrux 101F", similarly disclose heat expandable exothermic anti-piping compositions.

The relevance of the above five patents and Ferrux 101 as prior art in the present case is perhaps best illustrated by adopting the nomenclature used by the parties during trial. At trial, the ingredients of various heat expandable exothermic anti-piping compositions were referred to in shorthand notation by using the letters A, B, X[1], and X, with the letters having the following significance:

(a) "A" signifies the heat insulating refractory ingredients used in anti-piping compositions, comprising one or more materials;

(b) "B" signifies the exothermic ingredients used in anti-piping compositions, comprising one or more materials;

(c) "X[1]" signifies a heat expandable material such as perlite or vermiculite, but *not* vermicular graphite;

(d) "X" signifies heat expandable vermicular graphite.

With the exception of Osborn, each of the above-mentioned patents and Ferrux 101F discloses three-component exothermic anti-piping composition comprised of: (1) a heat insulating refractory material; (2) an exothermic component; and (3) an expandable material (but not vermicular graphite) that intumesces on the feeder head. In other words, the Charman, Takashima, Hinckley, and VEB Patents (and Ferrux 101F) are all ABX[1] compositions.

The Osborn Patent taught that X alone, either in expanded form using its refractory character, or in unexpanded form, could be used as a hot-top powder. Plaintiff became aware of the Osborn teachings, substituted X for X[1], and produced, as a result, the patent in suit. Thus, the only difference between the '642 compositions and the listed patents was the substitution of X for X[1].

■ It is the *act of selection* which must be non-obvious in order for a combination

patent to satisfy the standards of Section 103. *Smith v. Acme,* supra, at 1095; *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963 (7th Cir. 1979). The testimony at trial revealed that at the time of the invention, the average person in the hot top art had technical qualifications which included an advanced degree in metallurgy and chemistry and considerable experience in the feeding aids industry. Certainly the substitution of X for X[1] was obvious and well within the grasp of such an individual, and hence within the "skill of the art" in 1967.

The recipes of the Charman, VEB, Takashima and Hinckley patents, as well as Ferrux 101F, indicate that the use of heat expandable materials, either before or after expansion, in anti-piping compositions was common practice before the Osborn patent issued. The Charman patent broadly teaches the use of known expandable materials, i. e. vermiculite or perlite, for anti-piping compositions. Like Charman, the VEB Patent teaches that unexpandable vermiculite or other expandable refractory minerals could be used in anti-piping compositions. Indeed, a large number of plaintiff's own commercial recipes contained unexpanded vermiculite years before the filing of the patent in suit (PX–6). Thus, the concept of an ABX[1] composition had been disseminated virtually world-wide prior to issuance of either the Osborn or '642 Patents.

The teachings of these patents further indicate that it was known in the art prior to Foseco's first work with vermicular graphite that reduced density compositions require less material by weight per application. The Osborn Patent (perhaps the single most important reference in this litigation since it was the issuance of this patent that caused plaintiff to investigate vermicular graphite as an ingredient in anti-piping compositions) subsequently added the knowledge that high expansion (lower expanded density) can be achieved with vermicular graphite. Thus the art recognized prior to the patent in suit that vermicular graphite would provide superior thermal insulation properties at a reduced application rate. Plaintiff's early experience was consistent with that expectation.

Defendants' expert witness, Dr. W. O. Alexander, testified at trial that performance variations could readily be achieved by one of skill in art in 1967, and could be achieved, for example, by varying the exothermic ingredients. An increase, or decrease in the heat, smoke and fume generated by the hot top process would occur with such variations (DX–167). The '642 Patent was one such variation of already-known ingredients, as is seen by defendants' "Prior Art Chart"—a listing of the ingredients contained in the prior patents and the patent in suit:

### PRIOR ART CHART

#### '642 Patent

Heat Insulating Refractory
10–50%   Exothermic Ingredient
1–50%   Vermicular Graphite

Example   (Column 2)

| Alumina | 46% |
|---|---|
| Expanded Perlite | 4% |
| Aluminum | 30% |
| Wood Flour | 6% |
| Sodium Fluoride | 2% |
| Vermicular Graphite | 12% |

**Charman Patent (02–22–49)**

| Grog | 50% |
|---|---|
| Unexpanded Vermiculite | 30% |
| Wood Flour | 20% |

**Takashima Patent (06–05–69)**

| Aluminum Oxide | 34% |
|---|---|
| Metallic Aluminum | 15% |
| Iron Oxide | 18% |
| Potassium Nitrate | 3% |
| Unexpanded Vermiculite, unexpanded perlite, or unexpanded obsidion | 30% |

**Hinckley Patent (12–06–67)**

| Expanded Perlite | 5% |
|---|---|
| Aluminum Dross [Alumina And Aluminum] | 69% |
| Red Iron Oxide | 10% |
| Cryolite | 3% |
| Sodium Or Potassium Nitrate | 7% |
| Unexpanded Vermiculite Or Unexpanded Perlite | 6% |

**V E B Patent (06–05–69)**

| Aluminum Oxide | 30% |
|---|---|
| Expanded Perlite | 1% |
| Granulated Aluminum | 29.5% |
| Iron Oxide | 15% |
| Sawdust | 12% |
| Chalk | 3% |
| Phenolic Resin Dust | 4% |
| Fluorspar | .5% |
| Unexpanded Vermiculite Or Other Expandable Refractory Minerals | 5% |

**Ferrux 101 F**

| Ball Mill Dust [Alumina And Aluminum] | 46% |
|---|---|
| Ball Mill Dust— High Aluminum/Low Chlorine [Alumina And Aluminum] | 30% |
| Sodium Nitrate | 8% |

**Osborn Patent (03–14–67)**

| Vermicular Graphite | 100% |
|---|---|

| Ferrux 101 F | | Osborn Patent (03-14-67) |
|---|---|---|
| Aluminum Blown Powder | 1% | |
| Sodium Silicofluoride | 3% | |
| Medium Fine Mill Scale | 8% | |
| Unexpanded Vermiculite | 4% | |

The '642 Patent only minimally varied the relative proportions of the ingredients contained in the other recipes.

The relevance of the above recipes as prior art and the absence of any meaningful technical differences between that prior art and the '642 Patent is demonstrated by other facts adduced at trial.

The VEB patent used in combination with Osborn was interpreted as teaching the combination of the '642 Patent, thereby causing rejection of plaintiff's '642 compositions in Germany.

Similarly, the Takashima Patent was relied upon in opposition to and cited as prior art barring issuance of Foseco's Japanese counterpart to the '642 application in 1972 (DX-70).

In the U.S. patent application, the examiner did not cite any exothermic expandable hot top (ABX[1]) compositions. The Meyer Patent, which in combination with the Osborn Patent formed the basis for the examiner's denial of the original '642 applications, may be discounted as relevant prior art. The Meyer patent does not expressly relate to anti-piping and was recognized by all parties at trial to be of no value as a hot top; rather, it serves the limited function of a mold coating (a process of smearing on a wash to prolong mold life) due to the fact that it contains water, an unacceptable ingredient in a hot-top formula. Martin Issott, whose affidavit caused the '642 Patent to issue, characterized tests of the substitution of Osborn's vermicular graphite into the Meyer composition as "ridiculous." (Issott Dep., p. 119) David Vincent, one of plaintiff's expert witnesses, stated that he would not test any Meyer composition as an anti-piping composition, with or without vermicular graphite. Another witness for the plaintiff, Dr. Pehlke, explained that he did not test any composition of the Meyer Patent because it "is a mold coating."

Plaintiff, on the other hand, did not direct the examiner's attention to any of the known ABX[1] compositions (the failure to disclose being the subject of defendants' fraud allegations), although the testimony and exhibits introduced at trial clearly indicated that plaintiff was aware of and concerned about these patents from the time of its initial research on anti-piping compositions containing vermicular graphite through the patent application process (DX-45).

The examiner's failure to cite the ABX[1] compositions in his review of the '642 application does not detract from the relevance of those patents and products as prior art; rather, it weakens the presumption of validity of the patent in suit. See *Smith v. Acme*, supra, at p. 1090-1091. By contrast, plaintiff's familiarity with the patents only serves to reinforce this Court's conclusion that the '642 Patent is merely an obvious variation on a well-known theme.

### B. *Synergism*

Plaintiff nevertheless urges that the '642 patent, although comprised of previously known components, has been formulated in such a manner to yield surprisingly favorable results. This claim was described at trial by plaintiff's expert witness, Dr. Robert D. Pehlke.

"The acid-treated graphite alone was a material of carbon and would appear to be highly undesirable as an anti-piping composition and to combine it with an exothermic material which had mediocre characteristics and to achieve the surprising and highly favorable results would be unexpected and unanticipated." (T. 596)

Assuming such a claim to be true, plaintiff's '642 composition would be patentable.

As the 6th Circuit explained in *Smith*, supra, at 1093:

"A device might be composed of various well known components put together in such a way as to form something unique and patentable. This approach of combining known materials to achieve a unique product is called 'synergism.'

"Any definition of synergism necessarily varies depending on whether the particular claim in issue is for a process, a formula, or a utility patent. Courts have roughly defined synergism as when the 'whole in some way exceeds the sum of its parts,' when the combination produces a 'new or different function,' or 'unusual or surprising consequences.' *Philips Industries Inc. & Mobil Temp. Inc. v. State Stove & Manufacturing Co., Inc.*, 522 F.2d 1137 (6th Cir. 1975)."

The '642 Patent claims the following improvement over prior exothermic anti-piping compositions:

"... the improvement wherein said composition contains about 1–50 percent by weight of acid-treated graphite which on heating intumesces to give a low density highly insulative vermicular structure, said composition yielding a heat insulative layer when placed on the exposed surface of molten metal in combination with a minimization of carbon pick-up by the metal and dust generation." (Claim 1, Col. 4. Line 10)

Plaintiffs first pressed the synergistic quality of the '642 Patent in response to Examiner Hayes' rejection of the first patent application for the stated reason that the '642 compositions were an obvious substitution of Osborn's vermicular graphite for the graphite in U.S. Patent 3,340,082 (the "Meyer patent") (DX–3). In an effort to distinguish the Meyer Patent cited by the examiner, plaintiff filed an affidavit by Martin Issott on January 12, 1973 (DX–3A). The Issott Affidavit purported to test and substitute Osborn's vermicular graphite into the Meyer composition—with the conclusion that such substitution produced a product that was inoperative in the hot-top arts (DX–3A). The affidavit concluded that the product resulting from the attempted substitution was not as good as the '642 composition.

The letter forwarding the affidavit to the Patent and Trademark Office stated that the affidavit described tests with "this invention" and "the present invention." (DX–3). But it did not in fact make such a comparison. The Foseco composition Issott tested was an insulating AX composition. Issott did not test an ABX composition. Thus, the Issott Affidavit did not contain any test data for any composition within the '642 Patent.

Examiner Hayes reviewed the Issott Affidavit and refused to enter it. On February 20, 1973, plaintiff filed a continuation application. Examiner Hayes again cited the Osborn and Meyer Patents as indicia of obviousness. However, Examiner Hayes stated in his Office Action mailed on June 19, 1973, that he would consider a showing of unexpected results for the '642 composition (DX–3). The Issott Affidavit was refiled shortly thereafter. Its contents were essentially the same. Again, the materials tested were outside of the '642 Patent. The recipe tested as being a Foseco product was the AX recipe of the '898 Patent, not an ABX recipe within the definition of the '642 Patent. Moreover, the Issott Affidavit did not report on problems known to plaintiff, i. e. carbon and sulphur pick-up, odor and collapse (DX–23, DX–37, DX–38, DX–41, DX–63, DX–65, DX–68). In fact, the experiments reported in the affidavit offered no basis for comparison because they did not replicate the '642 Patent.

Thus, although the '642 Patent was eventually accepted by the Patent Office, the synergistic effects claimed by the '642 Patent were neither proven nor existent.

At trial, plaintiffs reiterated the synergistic quality of the '642 Patent. Plaintiff's expert witnesses, David Vincent, presently director of Projects Division of Foseco Steel Mills International Ltd., and Robert Pehlke, testified that the patented product shows synergism because the combination of ATG, which is not useful itself as an APC, with an average exothermic APC leads to results which are better than results achieved with

any previously known APC. Vincent and Pehlke (the latter on the basis of comparative tests) stated that the '642 Patent manifested the following unexpected and surprising results:

(1) superior performance at application rates which are generally about 50 percent of the application rates for conventional APCs;

(2) excellent heat insulation and resultant increases in yield of as much as 3 percent;

(3) little or no contamination of the metal being cast, i. e. no carbon pick-up;

(4) minimization of "dusting" for the expanded ATG and negligible smoke and fume; and

(5) non-crusting, free-flowing characteristics which enable it to follow the contour of the shrinking metal and to "self-heal" any gaps that open in the APC if the casting or ingot is moved before solidification.

In order for the '642 Patent to be deemed synergistic in nature, the "combination of elements must produce something more than the sum of the pre-existing elements; there must be a synergistic result that is itself nonobvious." *Roanwell Corp. v. Plantronics, Inc.*, 429 U.S. 1004, 1006, 97 S.Ct. 538, 539, 50 L.Ed.2d 617 (1976).

As the 6th Circuit explained in *Smith v. Acme*, supra, at 1094:

"We understand that the purpose of the synergistic theory is to enable an inventor to patent an idea when the elements of the idea are commonly known but the combination in which the inventor has arranged the configuration contributes new knowledge to the specified field of art. *Nickola v. Peterson*, 580 F.2d 898, 910–911 (6th Cir. 1978) cert. denied, 440 U.S. 961, 99 S.Ct. 1504, 59 L.Ed.2d 774 (1979); *Philips Industries v. State Stove & Mfg. Co., Inc.*, 522 F.2d 1137 (6th Cir. 1975). However, courts have scrutinized very carefully combination patents to avoid a flood of the garden-variety but not patentable 'good ideas.' This approach follows the teaching of *Anderson's-Black Rock v. Pavement Co.*, 396 U.S. 57, 61, 90 S.Ct. 305 [308], 24 L.Ed.2d 258 (1969). The Supreme Court recently applied stringent standards when examining a combination patent in *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1976). In *Sakraida*, the patent constituted a combination of old elements to produce an abrupt release of water directly on a barn floor from storage tanks. This water was then used to clean animal waste from barns. Reversing the Court of Appeals' finding that the combination patent yielded a synergistic result, the Supreme Court stated '. . . *this patent simply arranges old elements with each performing the same function it had been known to perform, although perhaps producing a more striking result than in previous combinations. Such combinations are not patentable under standards appropriate for a combination patent . . .*' *Sakraida v. Ag Pro, Inc.,* supra." (Emphasis added) *Id.* at 1094.

The Court continued:

"It seems apparent from the *Black Rock* and *Sakraida* decisions that the Supreme Court has recognized synergism to a limited extent as a term symbolizing the more stringent standard for combination patent claims. When confronted with a combination patent this standard requires an isolation of that unique essence of the combination and a determination of whether that essence makes an authentic contribution to mankind's store of knowledge. Unquestionably this standard was not meant to reduce emphasis on the *Graham* analysis for obviousness under § 103. If we understood synergism to require such, synergism would be tossed aside immediately. Rather, it is merely a symbolic reminder of what constitutes nonobviousness when a combination patent is at issue." *Id.* at 1095

In the instant case, it must be concluded that the '642 Patent lacks the "unique essence" to survive the stringent standard for combination patent claims.

As noted previously, it has been long-recognized that the high temperatures which anti-piping compositions are subject to in

the casting process cause smoke and fume (DX–167), and that such problems are lessened with the use of higher purity ingredients (DX–167). Moreover, the importance and effect of density and thickness on the insulation properties of materials—i. e. that greater thickness achieves greater insulation and that less dense materials tend to be better insulators—were known by those skilled in the art long before 1967. Smoke, fume, dust, density, and application rates—these parameters and their impact on heat expandable, exothermic anti-piping compositions were reflected in the Charman, VEB, Takashima, and Hinckley patents. Charman and Takashima discuss at length the reduced weight required by application of low density, heat expandable, exothermic anti-piping compositions. Contrary to plaintiff's contentions, the performance of the ABX composition of the '642 Patent, albeit an improvement over prior art, was predictable following Osborn's proposal to use vermicular graphite as a hot-top. The '642 Patent was aptly characterized by Dr. Alexander as "(A) case of cookbook recipe work and studying the performance under a given constant condition." As such, the '642 Patent was a progressive step in the feeding aids art, but it produced neither surprising nor unexpected revelations.

As stated by the Court in *Picard v. United Aircraft Corp.*, 128 F.2d 632, 636 (2d. Cir. 1942):

> "Unless we are to mistake for invention the slow but inevitable progress of an industry through trial and error, and confer a monopoly merely upon the exercise of persistent and intelligent search for improvement, there was no invention in this."

The '642 compositions followed immediately on the heels of Osborn's teachings. As substitutions, they were obvious. As a response of the art to the Osborn Patent, they were unpatentable.

Finally, evidence concerning "secondary considerations" was offered by the parties at trial. *Graham*, supra, 383 U.S. at 18, 86 S.Ct. at 694. Plaintiff characterizes the commercial success of the '642 Patent as "dramatic" after an initial public reception that was colored by skepticism. Plaintiff notes that the invention of the patent in suit was quickly adopted by defendants, immediately upon Rumbold's departure from Foseco. Plaintiff also cites the ten-year hiatus between the issuance of the Osborn Patent and the time when companies other than Foseco offered such a product as evidence of the "failure of others" to develop the ABX composition.

Although the secondary factors outlined in *Graham*, supra, are essentially factual, the ultimate issue is one of law. *Sakraida v. Ag Pro, Inc.*, supra; *Graham*, supra; *Reynolds Metals*, supra; *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77 (6th Cir.), cert. den. 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971). The subsidiary questions may tip the scale toward validity in a close case; however, "they cannot save a patent from invalidity when... there is such a plain lack of invention, and obviousness is clear." *American Seating Co. v. National Seating Co.*, 586 F.2d 611, 622 (6th Cir. 1978). See also *Eltra Corp. v. Basic, Inc.*, supra at 756.

In the present case, the commercial success of the '642 Patent and the satisfaction of long-felt needs are not alone sufficient to establish that the product is the result of invention. The act of selection—the substitution of X for $X^1$ in this combination patent—was clearly obvious in light of the state of the art in 1967. Moreover, the new recipe did not yield synergistic results so as to legally distinguish it from the prior art and satisfy the "demanding" standard of invention.

## CONCLUSION

■ In sum, the '642 Patent is invalid due to its obviousness to a person skilled in the field at the time of invention. The discussion set forth above encompasses the 3-pronged factual standard articulated in *Graham*, supra, specifically that:

(1) The scope of the prior art is shown by several prior patents—the Charman, VEB, Takashima, Hinckley, and Osborn patents—and by plaintiff's own prior commercial

**1268**

product—Ferrux 101F. These patents and products all teach the use of exothermic anti-piping compositions consisting (with the exception of Osborn) of three materials: 1) a particulate heat insulating refractory material; 2) an exothermic component; and 3) an expandable material which does not anticipate the use of vermicular graphite. The Osborn Patent teaches the use of vermicular graphite alone as a hot-top powder in both expandable and pre-expanded form.

(2) The technical evidence disclosed that the sole distinguishing feature of the '642 Patent is the substitution of vermicular graphite *for other* expandable materials, i. e. vermiculite or perlite, used in the prior art. In the vernacular adopted by the parties at trial, plaintiff substituted X for X[1], producing as a result an ABX composition as compared to the ABX[1] recipes which constituted the prior art. The '642 Patent teaches only slight variations in the relative proportions of the other ingredients.

(3) In light of the prior art, the act of substituting X for X[1] (and the minimal variation in proportions of other materials) would clearly be obvious to one of ordinary skill in the feeding aids industry at the time of invention.

(4) The record is devoid of any evidence that the '642 Patent produced synergistic effects.

(5) The secondary *Graham* factors cited by the plaintiff are not sufficient to save the '642 Patent from invalidity under the circumstances of the case. The '642 Patent simply does not possess the "unique essence" to withstand the strict standard of scrutiny required of a combination patent. Its obviousness is clear; its invention is not.

These factual conclusions render it unnecessary to resolve defendants' allegations that plaintiff committed a fraud on the patent office due to its purported failure to disclose relevant and material prior art.

This opinion shall constitute the findings of fact and conclusions of law pursuant to FRCP 52.